Good morning. Matt Larson of the Federal Defender's Office for Mr. Rose. Your Honors, Pamela Tarek was injured and the question was asked. The prosecution's theory was that Ms. Tarek was the victim of domestic violence and that her partner, Mr. Rose, had assaulted her. The defense was that Ms. Tarek was injured while striking Mr. Rose, while suffering a seizure, and then being held by Mr. Rose while she convulsed. There were three eyewitnesses to this, Your Honors, but only two of them testified at trial. Mr. Rose testified to Ms. Tarek's strikes and seizure. Ms. Tarek, in fact, also corroborated that, but was then impeached by her prior statements about being assaulted. The question was then, Your Honors, for the jury whom to believe, but the jury did not hear all the evidence. There was a third witness that night, a witness who did not testify at trial and who would have confirmed that Ms. Tarek had indeed suffered a seizure. Well, counsel, could you stop right there? You're talking about Mr. Clements, right? Yes, Your Honor. So isn't the obvious question that if Clements had been called at trial, his statements that he had given to the police would have been forging? Those did not help your client, right? I don't know that they – they're not devastating for the client. They're certainly not as devastating as the prosecution makes out. This is what Mr. Clements told the police, according to the police. He said, I was in the room. I heard a fight. There was no dispute that there was a fight. There was a verbal argument, which at some point turned physical. He came out and he saw Mr. Rose on top of Ms. Tarek. The explanation that Mr. Rose proffered was he was holding her at that point while she was convulsing from a seizure. That's not the impression that Mr. Clements had, though. Mr. Clements was afraid that Rose was hurting Tarek. Respectfully, Your Honor, that's the impression the police officer conveyed in the report. The impression Mr. Clements conveyed in his own declaration was that what he initially thought might have been a fight was, in fact, not a fight. It was, in fact, Mr. Rose's efforts to hold Ms. Tarek while she was convulsing. Did Mr. Clements also state that he tried to calm Rose down, that Rose had a very bad temper, and that Rose threatened to kill Tarek? Again, Your Honor, these are statements coming from Mr. Tarek. Threatening to kill Tarek, is that a type of therapy for somebody who is in convulsion? Clearly not, Your Honor. But, again, there was no dispute that there was a verbal argument that night. Now, if someone may say, I'm going to kill you in the heat of an argument, it doesn't mean the person is physically assaulting that other person. It can mean that. It can. And, Your Honor, I'm not saying that his statements to the police are good, necessarily, for the defense. But what I am saying is that Mr. Clements should have been heard by the jury. What Mr. Clements said in his declaration was that when the police came there that night, he was very careful what he told them because he thought, well, I have experience with the police, and the police have an approach of arrest first, ask questions later. I don't want my friends to be arrested. I don't want their infant child taken away to foster care. So I'm going to be very careful and limited in what I tell them. He explained in his declaration, however, which defense counsel would have discovered had he bothered to investigate, that, in fact, Ms. Tarek had indeed suffered a seizure, that Mr. Rose was not the aggressor, that what began as a verbal argument and then turned into a physical altercation was instigated by Ms. Rose, and then in the midst of her fury, as she confirmed at trial, she suffered a seizure, she fell to the ground, Mr. Rose picked her up and held her as she was convulsing. This just sounds upside down and backwards to me. If Mr. Clements' position in the declaration is that he wanted to be very careful because he's had this experience with the police, then it seems to me that what he would have said to the police is what he's saying in his declaration, that there was a seizure, he didn't want his friends to get arrested, and explain what you have just explained to us, as opposed to what he told the police that night, which is far more incriminating vis-à-vis your client. How does that square with him wanting to be cautious when he was interviewed by the police? I can't attest to Mr. Clements' ability to think on the spot. He could have said something better, and I won't dispute that. But the question here on appeal is whether any prejudice was done by denying the jury his testimony, and what he would have told the jury. Isn't there a problem, though, isn't there a problem to the extent that counsel, knowing that Clements had made these statements, might have been concerned that to put him on would weaken his case? This Court has said repeatedly, Your Honor, that pretrial information, indicating that a witness's credibility may be compromised or a witness's testimony may not be entirely good for the defense, is not reason to not talk to the person. Now, here the facts are that only three people witnessed this event, and we have two conflicting accounts. The third person, who could potentially corroborate the defense, is not even spoken to by the defense counsel. But the record indicates that counsel knew of Clements, does it not? Mr. Rose told his lawyer, I want you to call Clements. He was there. He will confirm I did not attack Ms. Tarrick. He will confirm she suffered a seizure. Please go talk to him, and here's how to do so. The lawyer never did. He never contacted Mr. Clements. He never even spoke to Mr. Clements. Counsel, we understand that. What we're telling you, I think, is the record seems to cry out that this was a tactical decision by defense counsel. Your Honor, respectfully, it couldn't have been a tactical decision. This Court has made clear a tactical decision cannot be made unless reasonable investigation is undertaken. Here there was no investigation. That doesn't mean he has to talk to Clements. It may be that he made the decision that wasn't – I mean, defense attorneys aren't charged with having to follow up to the ends of the earth every possible theory. They can't. No argument. So they have to make decisions about and prioritize, and why isn't this well within counsel's discretion to have decided after looking at the police report that he didn't want to go there with Mr. Clements? Because here, Your Honor, we're not talking about going to the ends of the earth and looking for every possible witness. There are three people in the apartment by night. Right. Two people give conflicting evidence. There's a third person who the defendant is pleading with his lawyer to interview because he says he will confirm the defense's theory. He will affirm – affirm – confirm the defense's account that he did not assault this person. This Court said in the Howard case, we have determined in other cases that attorneys do not fully discharge their duty to investigate even though they were equipped with reports from the police and defense investigators that indicated there were inconsistencies in witness accounts and that might undermine their credibility. This Court has said again and again that a lawyer, even when the preliminary information is not wonderful, at minimum has to talk to the person, hear their story, assess their credibility, see if they should call the person or not. The other person. No, no. I'm not saying that, Your Honor. Right. In this case, three witnesses. Three. Two give conflicting accounts. The third, who stands to corroborate the defense and exonerate the defendant, is never spoken to. Those are the facts here. I understand the facts here, counsel. Now, what you're saying, then, is that this is an EDPA case, right? Mm-hmm. And under 2254 D1, there is clearly established Supreme Court law that a defense counsel renders ineffective assistance of counsel under the Sixth Amendment by not talking to a witness regardless how much information he has about what the witness will say from the police and other sources. True. In this case, true, yes. No, no, not in this case. In this case, I'm asking, is a Supreme Court jurisprudence clearly established? I don't want to repeat my question. Of course not, Your Honor. Give me the case. What the Supreme Court has clearly established. Please give me the case that so says. Strickland says that. No, not Strickland. Strickland didn't involve failure to talk to a witness. The duty to investigate, Your Honor, is. Tell me the case that clearly establishes that a defense counsel violates 2254 D1 by not talking to a witness regardless the amount of documentary evidence counsel has as to what the witness has said. Wiggins, Your Honor. Wiggins. Wiggins involves a situation where it was a capital case and the question was what kind of evidence to put on in mitigation. The defense counsel had certain pre-sentence materials which, based simply on those, counsel decided not to undertake any further investigation into the facts, which, if counsel had done so, would have uncovered significant mitigation that would reasonably have made a difference. Was Wiggins a case where a witness existed who was not spoken to by counsel before trial? A particular witness off the top of my head, I can't say. I'm not sure I'll have to look at it, Your Honor. It was either a person or other evidence. Do you have another case that's spot on? I will get you another case that's spot on. Is it in your brief? It's Strickland, Your Honor. It's the duty to undertake reasonable investigation. Now, I'm not saying. That's the general, as we say in syllogisms, the general premise, right? Right. And the spot on case here. Can I talk to you about Wiggins just for a second? Isn't the principle that we take away from Wiggins that there's a certain amount of investigation that a defense counsel has to do before he or she decides not to go, as we said, not to the ends of the earth necessarily, but in order to decide not to pursue a defense. Isn't that right? Yes. Okay. So, obviously, that's a paraphrase on my part, but if that's the principle that you're taking away from Wiggins, I think that's the correct case to be citing, all right? I think that's, we're now communicating. And so my question is, why wasn't it enough for this counsel here? Why didn't he do enough, he or she, do enough by looking at that police report and deciding that's enough, I know enough now? Because I'll grant you, if there were three people in the apartment and there's been no attempt to talk to the third, that may well be a problem. Why wasn't it enough to look at the police report? Because here it's a police report from an officer, and the defendant says, what Mr. Clemens is saying in this report are essentially half-truths meant to protect me. If you talk to Mr. Clemens, you'll realize that what he said that night was meant to prevent either of us from being arrested, prevent my daughter from being taken away. The truth is, and Mr. Clemens says this in his declaration, he said, I dare not tell the officer that Ms. Carrick struck Mr. Rose. If he had said that, she would have been arrested, the baby is taken away. So on the spot, he's making a snap judgment effort to try to protect his friends in the only way he knows how. Now, it's flawed, I grant you that, and in hindsight, he could have done it better. No argument. I see your argument now. That's very helpful to me. Thank you. Thank you, Judge. Unless the panel has other questions for now, I will reserve the balance. No questions. Good morning, Your Honors. Scott Tarl for the respondent and appellee. Petitioner's counsel a moment ago said that he couldn't attest for Mr. Clemens' ability to think on the spot at the time that he spoke to the police officers. And I agree, and I would say that that's key, because what Mr. Clemens said to those police officers at the time of contemporaneously with the arrest, before he had a chance to think, before he had a chance to fabricate or to concoct, and what Ms. Tarrick said to the police that day, would have been far more credible in the eyes of the jury than what he's saying quite some time afterward, when his friend is on trial for this crime, and when his other friend, Ms. Tarrick, has also turned around and has taken the tact of trying to help Mr. Rose and protect Mr. Rose. Counsel, can I ask you a specific question about this? It seems to me in the state court, the Clemens Declaration was submitted to the Supreme Court, but not to the Court of Appeal. Is that right? That's correct. Could you speak to that? Because I think the briefing got a little bit muddled about what your position is regarding what we're reviewing. Right, because we had taken one position in the district court, and we had had a change of position. First of all, about why that declaration wasn't submitted, there was apparently an attempt to submit it to the Court of Appeal after the Court of Appeal had already ruled, and so the clerk's office rejected that. It never came before the Court of Appeal, and it certainly didn't inform the decision that the Court of Appeal had already made. Okay. The California Supreme Court did get that declaration. Our position is that the so-called silent denial by the California Supreme Court is under Richter an independent merits determination which should be examined for its reasonableness. I recognize that there is authority to the contrary from this court. However, I would say that in this particular case, that should be the case because there was a change of evidence. There was an additional declaration before the California Supreme Court that wasn't before the California Court of Appeal. But regardless, either decision that one were to look at was eminently reasonable under the circumstances, and keeping in mind the standard under Richter. So, Counselor, your position is that it doesn't make any difference whether we accept your argument that the Supreme Court was a merits determination including attention to this particular evidence or the DCA. In other words, from the State's point of view, it doesn't make any difference? Absolutely, the same outcome. The difference, of course, with the State Supreme Court with the declaration, the Clemens Declaration, we would have to assume that that declaration is the best testimony for the defense perspective that Mr. Clemens would have provided had he been called to trial. And that declaration just simply fails to account for several things. And, first of all, as we've pointed out, had he testified all of these prior statements would have come in, and contrary to how Petitioner's Counsel characterizes it, it would have been absolutely devastating. Well, would you respond to Mr. Larson's specific points about that declaration, the points that he just made? Certainly. If he were on the witness stand and he were to testify that what he was saying to the police at that time, he was simply saying in order to protect the integrity of this family so that the parents wouldn't be taken away, so that the baby would not have a father, why on earth would he tell the police that he heard Petitioner threaten to kill Ms. Tarek? How does that protect anything? That strikes me more as a statement made by someone who, as Petitioner's Counsel said, couldn't think on his feet with simply saying what he saw, calling it as he saw it, and that's what he heard. And another interesting thing about that declaration, Your Honor, is that nowhere in that declaration does Mr. Clemens ever disown or acknowledge that statement to the police about hearing Mr. Rose threaten to kill Ms. Tarek. He doesn't account for that at all, and he can't, because there is no plausible way of accounting for that except that it was true when he stated it. And the other thing that's really interesting about the statements made by Mr. Clemens contemporaneously and to the detective two days later is how consistent everything is when you look at those initial statements. It corroborates each other. Ms. Tarek stated that Mr. Clemens was massaging Petitioner to try to calm him down. A little detail, that's the details that sometimes click. And interesting enough, Mr. Clemens says the same thing. And then the physical injuries. Mr. Clemens' declaration utterly fails to account for those. There is no explanation for why Ms. Tarek would have bite marks on her nose, why she would have two scratch lines down the side of her neck, which were still oozing blood when the police came, why she had bruise marks on her neck. I'm not sure how holding her down to protect her from a seizure would include holding her by the neck and inflicting those lacerations to her neck, although it does corroborate what Ms. Tarek said to the police, that he grabbed her by the neck when what she was saying was not at all meant to protect Mr. Rose. Overall, if defense counsel had made the mistake of calling Mr. Clemens at trial, the impact would have been devastating. The people's case was strong. It would have been all the more stronger because we would have had this third person corroborating through these prior statements all of the devastating details that were in Ms. Tarek's original statements and shown by the physical evidence and with no possible benefit, and he would have been on the witness stand confronted with each one of these statements, and he would have had to acknowledge making all these statements, and as we see from the declaration, he wouldn't really be able to explain all these statements. It would have been a mistake to call Mr. Clemens. Mr. Larson, would you meet your friend's point that there were bite marks on the nose of Tarek and explain how a seizure therapy includes biting the nose of the patient? What the police report said, Your Honor, was that her nose was bruised and swollen. There was no medical evidence put on that that was caused by a bite as opposed to, for example, a fall to the ground, which there was evidence of Ms. Tarek doing. This – everything that Your Honors were just talking to my colleague about are basically questions that the jury could have sussed out if they had heard all the evidence. They did not. Society has a critical interest in getting things right in trial. Now, here we have two witnesses who are put on at trial, and they both say in a case of alleged assault, no assault occurred. The prosecution says, Well, that – we had a strong case. Well, in fact, the prosecutor said in her opening statement, This is not such a simple case. You're going to hear a conflicting testimony. It's going to be a bumpy road, but ultimately I think we're going to get there. What happened? You put on one witness the alleged victim who says, I was not assaulted by the defendant. You put on the defendant who says, I did not assault the alleged victim. Now, who's the other witness in this case, Mr. Clemens? There was a credibility dispute at trial, right, because of the pretrial statements that Ms. Tarek had made to the police. So it's a who-do-you-believe kind of contest. It boils down to – Could I ask you a question? Yes, Your Honor. The record tells me that the victim got a tetanus shot because of this bite. Did the jury hear that? The victim reported to an officer that that happened. It was not corroborated, and I don't know if the jury ever heard that specific piece of information. But again, Your Honor, the thrust of all of this is it's critically important to get things right. When an individual is accused of a crime, especially in a domestic violence context, in my office's experience, we realize that society, and rightly so, takes a real interest in prosecuting DV cases because we realize that the victims in these cases often are in a vulnerable position, cannot stand up for themselves, and when pressured or when brought to trial will recant. So generally there's a feeling that, you know what, if the person gets on the stand and recants, we don't really believe it, we're going to believe what she said when the cops got there. This is not that case, Your Honor. Here, the other person in the room would have corroborated the defense. He would have said, you know what, it really wasn't an assault. You really do have the wrong person here. You would have then had a trial for an alleged assault where all three eyewitnesses tell the jury there was no assault. Under those circumstances, it is reasonably likely at least one of the 12 jurors would have had a doubt about Mr. Rose's guilt. Under those circumstances, there's a reasonable probability that at least one would have voted to acquit and there would have been at least a mistrial if not an acquittal.  Now, if you would like me to talk further about failure to investigate, I know we talked a lot about that at the beginning, I wanted to read one quote to you from the Howard decision, again, that we're relying on. The fact that a witness might not appear credible at trial is not a reasonable basis for failing to identify or attempt to interview him. Not calling him might be an entirely appropriate strategic choice if the attorney interviews him and concludes he would not be a credible witness. But again, Howard's attorney could not reasonably have made that tactical decision without first conducting an adequate investigation of the witness. That never happened here, and that's undisputed. If Mr. Clements had testified, the jury would have heard from all three eyewitnesses to this alleged assault that, in fact, it was not assault. When every person in the room is saying no crime occurred, at least one of those 12 jurors is going to have a reasonable doubt. Are you in agreement, Mr. Larson, that had Mr. Clements been interviewed, he would have said no more than he did in his declaration? If he had been interviewed by defense counsel? Right. Well, he would have said at least that, Your Honor, and we don't know what else he would have said. But he would have at least said that. Well, we don't know. We can't make decisions on what we don't know. And I'm not asking you to. I'm asking you to make a decision based on the declaration. So what you're saying is, had he been interviewed, he would have given the information in his declaration, and that would have made the difference to defense counsel and defense counsel would have called him. Indeed, Your Honor. Thank you. Thank you. The case of Rose v. Gibson has been argued within the counsel for their argument, and we will submit that case. Thank you.
judges: O'scannlain, Bea, Christen